UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:05CR00329 HEA (AGF) |
| ) | |
| TERRANCE A. BETHEA, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION REGARDING**
**ORDER FOR FORCED MEDICATION**

This matter came before the Court for a determination of whether Defendant, Tarrance Bethea, should be administered psychiatric medications, pursuant to <u>Sell v. United States</u>, 539 U.S. 166 (2003), following Defendant's refusal to take such medications. Following a hearing on May 4, 2006, this Court entered an Order for the involuntary administration of medication on May 8, 2006. This Memorandum Opinion sets forth the reasons for the Court's May 8, 2006 Order.

**Procedural History and Factual Background**

The proceedings pertaining to Defendant Bethea began approximately 11 months ago. On June 9, 2005, Defendant was charged in a criminal complaint with the robbery of a federally insured financial institution, in violation of 18 U.S.C. § 2113. A superseding indictment was filed on June 23, 2005, charging Defendant with two counts of bank robbery, one count related to the robbery of the Meridian Credit Union on June 6, 2005, and a second count related to the robbery of US Bank on June 13, 2005. It is alleged that in each of these robberies, Defendant approached the teller, requested

change, and when the cash draw was opened, jumped onto the counter and grabbed cash out of the cash drawer. See Affidavit, Doc. #2; Gov't Hrg. Ex. 3.

In connection with the second robbery, the record contains evidence that Defendant was observed driving away in a minivan that had been stolen from a car dealership by knifepoint on June 2, 2005. On June 14, 2005, one day after the second bank robbery, police officers observed the stolen minivan that had been used in the robbery and attempted to effect a traffic stop. Defendant, who was driving the minivan, attempted to flee, first in the minivan and then on foot. Defendant was apprehended following the chase and arrested. Gov't Hrg. Ex. 3.

On June 29, 2005, Defendant filed a motion for a psychiatric examination, pursuant to 18 U.S.C. § 4241. Finding cause to believe that Defendant was then incompetent, the Court[1] granted Defendant's motion for a psychiatric examination, and Defendant was committed the custody of the Attorney General for an examination on July 1, 2005. (Doc. #23).

Following Defendant's examination, the Court held a hearing on October 24, 2005. For good cause shown, the Court granted Defendant's motion that a second mental examination be conducted by a private examiner. In a psychiatric report filed on December 23, 2005, Dr. Michael T. Armour, Ph.D., concluded that Defendant was

---

[1] This case was initially assigned to Magistrate Judge Terry I. Adelman, who entered the initial order for the psychiatric examination. The case was thereafter transferred to the undersigned United States Magistrate Judge for pretrial proceedings.

suffering from schizophrenia, paranoid type, and was not then competent to stand trial. (Doc. #31).

In connection with his examination, Dr. Armour had records related to Defendant's prior mental health treatment that had not been available at the time of Defendant's initial examination. The prior medical records reflect that in March 1995, Defendant's parents took him to Deaconess Hospital Emergency Room after he displayed bizarre and paranoid behavior, including insisting that his parents unplug all of their television sets due to his belief that the government was monitoring him through them. Shortly after his arrival at the hospital, however, Defendant eloped. He called his parents 12 hours later, and reported that he had been hiding in a trash dumpster because he believed the police were looking for him to pay the emergency room bill. Two months later, Defendant was voluntarily admitted to the psychiatric unit of Barnes Hospital. He was diagnosed with schizophreniform disorder and treated with the anti-psychotic medication, Haldol.

In November 2001, Defendant was treated at the Centric Care Center in St. Louis, Missouri. His mother had taken him there, reporting his behavior as increasingly more depressed, guarded, and paranoid since 1995. He was diagnosed with schizophrenia, paranoid type, and prescribed the anti-psychotic medication, Risperdol. He was later seen for follow-up and reported feeling less paranoid on the medication.

Based on the information contained in both of the medical reports, further information obtained from counsel, and the Court's own observations, the Court found Defendant was not competent to proceed, and he was ordered committed to the custody

of the Attorney General for competency restoration, under 18 U.S.C. § 4241(d). (Doc. #33). Defendant was thereafter transported to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri (the "Medical Center"), and admitted for competency restoration in early January 2006.

The Medical Center provided a Forensic Update (Doc. #36), dated February 16, 2006, signed by Dr. Lee Ann Preston, Ph.D., Clinical Psychologist. Dr. Preston reported that although Defendant had adjusted well to a transfer to unlocked housing and generally followed the Medical Center's rules and regulations, he presented as isolated and withdrawn. Defendant would sit in his room, with the lights out, staring intensely at the wall or the floor. In interviews, he provided guarded, short answers, and his thinking was often disorganized and empty of meaningful content. Defendant also denied having previously received any psychiatric treatment, despite records of such treatment. Dr. Preston provided her opinion that Defendant was psychotic and in need of anti-psychotic medication, and reported that while Defendant had initially expressed a willingness to take medication, he had thereafter refused to sign a consent form. While noting that Defendant was neither dangerous nor at risk of becoming gravely disabled in the controlled environment of the Medical Center, the medical staff believed that anti-psychotic medication was needed to restore Defendant to competency. The medical staff requested the Court's approval for the involuntary administration of medication in accordance with Sell.

Following a status hearing with counsel, the Court entered an Order on March 3, 2006, directing the Medical Center to provide detailed information regarding the factors

outlined in the Sell opinion, including whether Defendant is currently a threat to himself or to others, and if so, what medications are indicated to address this condition; the expected efficacy, risks, and side effects of each such medication; whether such medications were "medically appropriate" for Defendant, i.e., in Defendant's "best medical interest in light of his medical condition"; whether each such medication could be administered voluntarily to Defendant; whether there were any treatments, less intrusive than involuntary administration of such medications, likely to achieve substantially the same results; and whether there were any viable means of compelling Defendant to take such medications, short of involuntary administration. The Medical Center was also directed to provide an opinion as to whether Defendant continues to suffer from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense; and if so, to provide similar details with respect to any medications indicated to address the condition, including whether the medication was "substantially likely to render Defendant competent to stand trial," and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." Sell, at 181. The parties were directed to provide their positions regarding the issue of involuntary medication following receipt of the Medical Center's response.

In a Forensic Psychological Report (the "Report") dated March 21, 2006 (Doc. #40), the Medical Center provided a detailed report addressing the questions posed by the Court Order. In the Report, the Medical Center expressed the opinion that Defendant

was not competent to stand trial or make other decisions regarding his legal case. His lack of participation made it difficult to have any meaningful, reciprocal conversation with Defendant, and he appeared to have no insight as to his mental illness. He continued to assert that his prior hospitalization was in fact a 7-day program of the Nation of Islam. Based in part on Defendant's prior positive therapeutic response to anti-psychotic medication, the Medical Center expressed the opinion that it was reasonable to expect that Defendant's condition could be stabilized with appropriate psychiatric intervention, including medication, and that he could be restored to competency. Without such medication, Defendant's condition was unlikely to change, and future treatment would become more difficult. The Medical Center further stated that such medications would enhance, rather than interfere with, Defendant's ability to assist counsel in conducting a trial defense, though continued monitoring would be necessary. The Medical Center also provided specific information regarding each proposed medication and the benefits and risks or side effects associated with each.

    The government now asserts that forcible medication of Defendant is appropriate under Sell in order to render Defendant competent to stand trial. Following a review of the Report by defense counsel's own medical expert, and having conferred with Defendant's mother, who expressed her opinion that it was in Defendant's best interest to receive involuntary medication, defense counsel also expressed his belief that involuntary medication was appropriate for Defendant and in his best interest.

    A hearing was held on April 13, 2006, at which time it was reported that on April 11, 2006, Defendant had reconsidered his position and had agreed to take Abilify.

Based upon this information, the hearing was continued until April 26, 2006. At the second hearing, Dr. Preston and Dr. Robert G. Sarrazin, M.D., Chief Psychiatrist, attended and participated by telephone. They reported that Defendant had voluntarily taken Abilify for ten days, but that on April 21, 2006, and continuing thereafter, Defendant had refused any further medication. A hearing was therefore scheduled for May 4, 2006. Both the parties and the Medical Center staff agreed that it was not in Defendant's best medical interest to transport him to St. Louis for the hearing, and the parties agreed that Defendant should attend the hearing by video conference from the Medical Center.

On May 4, 2006, the hearing on the government's motion for forced medication proceeded. Defendant attended by video conference, as did the government's witnesses, Drs. Preston and Sarrazin. Counsel for both parties were present in the courtroom.

At the hearing, Drs. Preston and Sarrazin provided testimony consistent with that contained in the March 21, 2006 Report regarding each of the Sell factors. The witnesses supplemented the information contained in the Report to detail the precise medications Dr. Sarrazin proposed to administer to address Defendant's condition. Dr. Sarrazin stated that he would consult with Defendant and attempt to obtain his agreement to take Geodone, a second-generation anti-psychotic medication that must be administered orally. If Defendant refused to cooperate with the oral medication, Dr. Sarrazin would likely administer Haldol, by injection, together with Cogentin to minimize any side effects. Drs. Preston and Sarrazin reviewed the expected efficacy, risks, and side effects of such medications; whether such medications were "medically appropriate" for

-7-

Defendant, i.e., in Defendant's "best medical interest in light of his medical condition"; whether such medications could be administered voluntarily to Defendant; whether there were any treatments, less intrusive than involuntary administration of such medications, likely to achieve substantially the same results; whether there were any viable means of compelling Defendant to take such medications, short of involuntary administration; and whether the medications were "substantially likely to render Defendant competent to stand trial," and "substantially unlikely to have side effects that will interfere significantly with Defendant's ability to assist counsel in conducting a trial defense." Sell, 539 U.S. at 181. Dr. Preston also reported that during the 10 days that Defendant had voluntarily taken Abilify, it had begun to have a positive effect, such that Defendant was able to engage in more meaningful conversation.

## DISCUSSION

In Sell, the Supreme Court set forth strict criteria that the government must meet before a court can approve the involuntary medication of a defendant for the purpose of rendering him competent to stand trial. The Supreme Court held that "the Constitution permits the Government involuntarily to administer anti-psychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." Sell, 539 U.S. at 179. A more "objective and manageable" inquiry

usually applies when medication is involuntarily administered "to render an individual nondangerous." Id. at 182.

With regard to the involuntary administration of medication for the purpose of restoring a defendant to competence to stand trial, the Court further expanded on the four factors that must be addressed.

> First, a court must find that <u>important</u> governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important.... Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill -- and that would diminish the risks that ordinally attach to freeing without punishment one who has committed a serious crime. We do not mean to suggest that a civil commitment is a substitute for criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may face and evidence may be lost.... Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.
>
> Second, the court must conclude that involuntary medication will <u>significantly further</u> those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a defense, thereby rendering the trial unfair....
>
> Third, the court must conclude that involuntary medication is <u>necessary</u> to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results....
>
> Fourth, as we have said, the court must conclude that administering the drugs is <u>medically appropriate</u>, <u>ie.</u>, in the patient's best medical interest in light of his medical condition....

Id. at 180-81 (emphasis in original).

In this instance, the Court finds that the government has met its burden on each of the four factors, which the Court will now address in order.

(1) <u>Important Governmental Interests are at Stake</u>

The Court finds that the government does have important interests of the caliber envisioned by the <u>Sell</u> court at stake in this case. The government has both an important interest and an obligation to protect the security of its citizens from known harms. Here Defendant is charged with serious crimes, namely two counts of bank robbery that each involved his jumping onto the counter and taking money from the teller's cash drawer. The getaway vehicle used by Defendant in connection with the second robbery had been taken at knifepoint from a car dealership, and when the police attempted to stop Defendant in this vehicle the day after the second bank robbery, he led the police on a chase. Defendant's criminal history also reflects some degree of dangerous or violent behavior. He has several prior convictions for grand theft of vehicles and a prior conviction for assault. While imprisoned, Defendant was also arrested but not convicted for battery by a prisoner and escape with force/violence. As such, the government has shown that there is a substantial need for prosecution in order to protect the safety of the community.

Delay in this instance will not serve anyone's interest. The government has a substantial interest in a timely prosecution. Here, much of its case will depend on the eyewitness testimony of witnesses whose memory may fade with time. Moreover, there is little on this record to suggest that Defendant's condition will improve soon, or indeed,

at any time, absent medical intervention, and any substantial delay in treatment will make future treatment more difficult.

> (2) <u>Medication is Substantially Likely to Render Defendant Competent to Stand Trial</u>

Defendant Bethea is diagnosed with schizophrenia, with significant psychotic symptoms, including disorganized thought and delusional ideation. His condition appears to interfere substantially with his ability to concentrate or participate in any meaningful conversation. To treat Defendant's schizophrenia, the Medical Center proposes to administer Geodone, if Defendant agrees to take an oral medication, or Haldol if he does not agree. Defendant has previously responded well to second-generation anti-psychotic medications similar to Geodone, with few if any side effects, and has also responded well to Haldol in the past.

From a review of all of the materials submitted in the case, the Court finds that the medication proposed by the Medical Center is substantially likely to render Defendant competent to stand trial and to significantly further the government's concomitant interest in assuring that Defendant receives a fair trial. As noted in the evaluation reports, Defendant has a documented history of mental illness, characterized by paranoia and delusional conduct. His current symptoms include thinking which appears disorganized and empty of meaningful content, as well as delusional ideation. Based upon the Medical Center's prior treatment of Defendant and his prior response to anti-psychotic medication, the medical staff is optimistic that similar anti-psychotic medications would be effective.

Based upon the expert reports and testimony, the Court finds that the medication regimen suggested by the Medical Center will likely result in a return to organized and rational thought, appropriate perception of reality, stabilization of mood, and enhanced clarity of thought, ability to communicate, and ability to exhibit appropriate behavior, such that it is substantially likely that Defendant will be rendered competent to stand trial. The most common side effects should not interfere with Defendant's ability to assist counsel and can often be successfully managed by a change in dosage, a change to a similar medication, or the co-administration of other medications.

(3) <u>Involuntary Medication is Necessary to Render Defendant Competent</u>

Anti-psychotic medication is the treatment of choice in this instance, and appears to be essential to the treatment of Defendant's disorder. Both the medical experts and defense counsel agree that the proposed medical intervention is necessary to the effective treatment of Defendant, and other forms of treatment such as education, psychotherapy, and behavioral interventions have not proven to be successful with Defendant, and are unlikely to be successful in the future. Indeed, during the periods of Defendant's commitment when he has not been receiving anti-psychotic medication, Defendant's condition has not improved.

(4) <u>The Proposed Medication is Medically Appropriate</u>

Finally, both the parties and the Court agree, after reviewing both the attendant benefits and the risks, that the proposed regimen of medication is medically appropriate. The type of anti-psychotic medications proposed for Defendant are "universally accepted in mainstream medical science as medically appropriate" to treat schizoaffective disorder.

As a group, psychiatric medications tend to have fewer side effects than most other classifications of medications. That Defendant has previously received the same or similar medications without serious side effects, further reduces the likelihood of such side effects now. Although there is some risk of serious side effects, the risk is slight and can be minimized through the type of careful monitoring available at the Medical Center. The Court is convinced that the proposed medications are medically appropriate and substantially likely to help Defendant.

Accordingly,

**IT IS HEREBY ORDERED** that the government's motion to administer involuntary medication to Defendant in order to render him competent to stand trial is **GRANTED** for the reasons set forth herein.

**IT IS FURTHER ORDERED** pursuant to this Court's Order of May 8, 2006, and for the reasons more fully set forth herein, that the U.S. Medical Center for Federal Prisoners at Springfield, Missouri, commence the involuntary medication of Defendant consistent this Court's Orders, and with the Forensic Psychological Report of Lee Ann Preston, Ph.D., dated March 21, 2006, as supplemented by the testimony of Drs. Preston and Sarrazin at the hearing on May 4, 2006.

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 11th day of May, 2006.